**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                          Case No.  3:11-cr-27-J-34JRK

RAMON GARCIA
_____/

## REPORT AND RECOMMENDATION[1]

This cause is before the Court on the Motion to Suppress Evidence (Doc. No. 19;
"Motion"), filed May 1, 2011.  The Motion is opposed.  See United States' Response to
Defendant's Motion to Suppress Evidence (Doc. No. 24; "Response"), filed May 14, 2011.
On May 17, 2011, a suppression hearing regarding the Motion was held.  See Minute Entry
(Doc. No. 25); Transcript (Doc. No. 30; "Tr.").  At the hearing, the parties requested leave
to file memoranda in support of their respective positions.  Defendant filed his Memorandum
in Support o[f] Motion to Suppress (Doc. No. 28; "Defendant's Memorandum") on May 30,
2011.  The Government filed United States' Supplemental Response to Defendant's Motion
to Suppress Evidence (Doc. No. 29; "Government's Supplemental Response") on June 13,
2011.

In the Motion, Defendant seeks to suppress "[o]ne hundred and [s]ixty [e]ight
marihuana plants seized on 12/16/10, from [D]efendant's residence and/or out-building

---

[1]       Within fourteen (14) days after service of this document, specific, written objections may be
filed in accordance with 28 U.S.C. § 636, Rule 59, Federal Rules of Criminal Procedure, and Rule 6.02(a), Local
Rules, United States District Court, Middle District of Florida.  Failure to file a timely objection waives a party's
right to review.  Fed. R. Crim. P. 59.

adjacent to the residence[2.]" Motion at 1.  Defendant acknowledges that his residence was searched pursuant to a search warrant, but he argues that "[t]he probable cause for the search was based on a prior illegal entry into the [D]efendant's residence and curtilage earlier that day by deputies from the Putnam County Sheriff's Office." Id.  In its Response, the Government contends Putnam County Sheriff's deputies "entered onto [Defendant's] property and ultimately opened [an] unsecured door to the residence because they reasonably believed that someone may [have been] in need of assistance."  Response at 4.  This warrantless entry of the property and residence was lawful, says the Government, based upon the "community caretaking" exception to the Fourth Amendment warrant requirement.  Id. at 5.  According to the Government, "[t]he officers entered the residence for the purpose of checking for individuals in need of assistance, and then exited the residence and obtained valid search warrants before conducting a search of the residence and outbuilding."  Id. at 7.  In the Government's Supplemental Response, it argues that the initial entry of the residence was lawful because the "emergency aid" exception to the warrant requirement made the entry reasonable under the Fourth Amendment.  Government's Supplemental Response at 1-2.  As to observations made by officers walking around the outside of the residence and outbuilding prior to the issuance of the search warrant, the Government argues Defendant did not have an expectation of privacy in those areas.  Id. at 3-4.

---

[2]          The "out-building adjacent to the residence" was also referred to at the suppression hearing and in the parties' papers as a barn and as a garage.

## I.  Background

On February 9, 2011, a federal grand jury returned a one-count indictment against Defendant, charging him with manufacturing or cultivating one hundred (100) or more marihuana plants, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B).  See Indictment (Doc. No. 1) at 1.  The crime is alleged to have occurred in Putnam County, Florida.  Id.  Defendant was arrested on March 29, 2011, and he made his initial appearance on that same date.  See Minute Entry (Doc. No. 6).  Defendant was arraigned on April 4, 2011, and he pleaded not guilty.  See Minute Entry (Doc. No.14). Defendant filed the Motion on May 1, 2011.  On May 6, 2011, a suppression hearing was scheduled for May 13, 2011 (Doc. No. 21).  The Government filed an Unopposed Motion to Continue Suppression Hearing on May 9, 2011 (Doc. No. 22).  The motion to continue was granted, and the hearing was rescheduled for May 17, 2011 (Doc. No. 23).  In the meantime, on May 14, 2011, the government filed its Response in opposition to the Motion.  The suppression hearing was held on May 17, 2011.  See Minute Entry (Doc. No. 25); Tr. Thereafter, Defendant's Memorandum was filed on May 30, 2011, and the Government's Supplemental Response was filed on June 13, 2011.  The Motion is now ripe for decision.

## II.  Summary of Evidence

The Government called three witnesses to testify at the suppression hearing:  Putnam County Sheriff's Deputy David Roe ("Deputy Roe"); Putnam County Sheriff's Detective Josh Lee ("Det. Lee"); and Putnam County Sheriff's Sergeant Christopher Stallings ("Sgt. Stallings or Det. Stallings").  Defendant submitted several photographs as a composite exhibit, but he did not submit any other evidence. Each witness's testimony is summarized in turn.

-3-

A.    **Deputy Roe**

Deputy Roe is currently a patrol sergeant with the Putnam County Sheriff's Office. Tr. at 8.  Prior to being promoted to sergeant on February 14, 2011, he was a road deputy for a little more than three years.  Tr. at 8, 60.  As a patrol sergeant, Deputy Roe maintains a shift, responds to calls, and handles administrative duties. Tr. at 8.

On December 16, 2010, Deputy Roe was on duty as a road or patrol deputy, assigned to the West District of Putnam County. Tr. at 8-9.  Sometime between about 10:00 a.m. and 11:00 a.m., Deputy Roe received a radio communication from the Sheriff's Office dispatcher concerning a residence located at 120 Deep Lake Road.  Tr. at 10-17; see Gov.'s Ex. 1 (compact disc containing call to Putnam County Sheriff's Office and dispatch call).  The dispatcher advised Deputy Roe that a neighbor, Charles Houton, had called the Sheriff's Office and reported an incident involving the front gate to the 120 Deep Lake Road Property. Tr. at 10, 12, 61.  The dispatcher characterized the matter as a "criminal mischief complaint," and the dispatcher further stated that the matter appeared significant or suspicious in nature.[3] Tr. at 11-12.  At the time he received the call, Deputy Roe was working an accident with the Florida Highway Patrol in the George's  Lake area of Putnam County.  Tr. at 11. Deputy Roe advised the dispatcher that he would respond to 120 Deep Lake Road, and he arrived there about thirty (30) minutes after he received the initial call from the dispatcher. Tr. at 14.  Deputy Roe estimated that "driving time" from his location to 120 Deep Lake Road

---

[3]        Deputy Roe did not speak to Mr. Houton directly, and Deputy Roe did not listen to the call between Mr. Houton and the dispatcher on December 16, 2010.  Tr. at 61-62.  Evidently, Deputy Roe listened to the recording of the call sometime after December 16, 2010 and before the suppression hearing.

was "at least 10 to 15 minutes, you know, depending on traffic.  It's just two-lane roads."  Tr. at 14.

Upon his arrival at the 120 Deep Lake Road address, Deputy Roe observed a metal gate that at some point in time was probably motorized and operated by remote control or by a keypad.  Tr. at 17; <u>see</u> Gov.'s Ex. 1A (compact disc containing video footage including gate), Def.'s Composite Ex. 1.  There was a brand new chain on the fence with a lock.  Tr. at 17-18.  Facing the gate, to the right, it looked to Deputy Roe like someone had "rammed" through the locked gate from the inside of the property, leaving part of the fence "smashed down."[4]  Tr. at 18.  Deputy Roe exited his vehicle and walked around the fence, where he observed tire tracks.  Tr. at 18, 62.  His inspection of the tire tracks indicated to him that the vehicle that made the tracks was traveling from inside the gate to the outside.  Tr. at 18, 62. It appeared to Deputy Roe the vehicle backed up and got a "running start" before "bust[ing]" through the gate.  Tr. at 18.  Deputy Roe walked up the driveway some distance to confirm the tire impressions were made from the inside heading to the outside.  Tr. at 63.  Deputy Roe did not see any blood during his inspection of the area.  Tr. at 62.  There were no other vehicles in sight.  Tr. at 61-62.  He observed a mail box.  Tr. at 19, 63; <u>see</u> Gov.'s Ex. 1A. He checked to see if mail had piled up in the box, and it had not.  Tr. at 63.

Deputy Roe had been to 120 Deep Lake Road once before on a call regarding loose horses in the area.  Tr. at 20.  The premises is located in a heavily wooded rural area.  Tr. at 62.  The houses are not as close together as houses in a gated community, but "you could

---

[4]     Deputy Roe referred to both a "fence" and a "gate" when he was talking about the area that was damaged.  A review of the photographs submitted into evidence by Defendant (Def.'s Ex. 1) and of the compact disc containing video footage of this area (Gov.'s Ex. 1) shows that it was the fence to the side of the gate that was damaged.

probably throw a stone and hit the next house[.]"  Tr. at 63.  Deputy Roe knew from his previous experience at the residence that there is a house and a barn on the property at the end of the driveway behind the fence.  Tr. at 20.

After completing his inspection of the gate area, Deputy Roe returned to his vehicle and proceeded up the driveway toward the house.  Tr. at 21-22, 63.  He passed through a second fence, a chain-link fence, where the paved portion of the driveway begins.  Tr. at 22.  This fence was open.  Tr. at 22.  He drove past the barn (to his right) and past an industrial-size dumpster (also to his right).  Tr. at 22.  The driveway curves around and makes a circle.  Tr. at 21.  He drove around the circle and parked in front of the house.  Tr. at 22-23.

Deputy Roe drew a large diagram of the 120 Deep Lake Road property (Gov.' s Ex. 6) which is reproduced below.  For ease of reference, the undersigned has labeled the front gate Deputy Roe observed when he arrived at the property.



When Deputy Roe arrived at the front of the house, no other vehicles were there.  Tr. at 23, 63-64.  Deputy Roe did not smell any odd odors like those of decomposing bodies or chemicals.  Tr. at 64.  There was no smoke coming from the residence.  Tr. at 64.  No one was moaning or sobbing, and there was nothing to indicate anyone was injured.  Tr. at 64.

Deputy Roe wanted to make sure the residence was secure, so he first walked around the front and back of the residence.[5]  Tr. at 23.  He explained that to ensure there had not been a burglary and to determine whether there was anyone inside the residence who needed assistance, he looked in the windows and checked to see if the doors and windows were locked.  Tr. at 23, 26.  He wanted to determine whether anyone had made entry or could have made entry into the residence.  Tr. at 26.  When Deputy Roe looked through a window into the kitchen area, he saw a bowl on the kitchen table that looked like it contained some kind of cereal and milk.  Tr. at 24.  He also observed a lighted candle and trash on the kitchen counter.  Tr. at 24; see Gov. Ex. 3B (photograph of window between main entrance and master bedroom door through which Deputy Roe observed the lighted candle).  He did not think someone normally would leave a residence with a candle burning.  Tr. at 24.  There were no signs of forced entry, and he was not in pursuit of anyone.  Tr. at 68.

After walking around the outside of the house, Deputy Roe went to the front door and knocked.  Tr. at 64.  There was no answer.  Tr. at 64.  He checked to see if the door was locked, and it was.  Tr. at 64.  He also may have checked the back patio door, but he cannot recall.  Tr. at 26-27.  At this point, Deputy Roe had not verbally announced his presence in any manner.  Tr. at 27.  Next, Deputy Roe checked the master bedroom door which was also in the front of the residence, and it was unlocked.  Tr. at 27; see Gov.'s Ex. 3C (photograph of master bedroom door).  Knowing that the door also had a deadbolt, he

---

[5]      It is evident from Deputy Roe's testimony that at this point in time, he walked around the immediate area surrounding the house itself, not the entire property.  Tr. at 23.

wanted to check if the deadbolt was engaged.  Tr. at 27.  Deputy Roe opened the door slightly, less than a foot, just enough to determine whether anyone was in the room.  Tr. at 27-28.  While the door was open, Deputy Roe detected a strong odor of fresh marihuana emanating from the room, but he did not see any marihuana.  Tr. at 27-29.  Deputy Roe recognized the marihuana odor based upon his experience as a member of the sheriff's office street crimes unit and based upon having made numerous drug arrests.  Tr. at 28.  He has investigated marihuana grow operations in the past.  Tr. at 28.  Also, Deputy Roe is certified as a drug recognition expert by the International Association of Chiefs of Police.  Tr. at 28.  Deputy Roe closed the door and did not enter the residence at that time.  Tr. at 27. He then advised the Sheriff's Office dispatcher about the unsecured door.  Tr. at 27. Another deputy was dispatched to the residence.  Tr. at 27, 29.

According to Deputy Roe, anytime there is damage to a house or a piece of property, or a criminal mischief call, it is the practice and procedure of the Sheriff's office to enter the residence if the residence is not secured.  Tr. at 67, 74-75.  The purpose of this practice and procedure is to make sure the house has not been burglarized and to see if someone is in the residence who needs medical attention.  Tr. at 74.  If a responding officer cannot get in touch with the homeowner, the officer secures the house by locking it, and the responding officer leaves a business card.  Tr. at 74-75.  A report is written, and the incident is documented.  Tr. at 74-75.  Deputy Roe followed this practice and procedure on December 16, 2010, Tr. at 75, but before he entered the residence to secure it, he waited for a back-up officer to arrive because an officer does not clear a residence by him or herself.  Tr. at 13, 29.  Deputy Roe "took cover" behind some trees in the front yard and kept an eye on the

residence, because he did not know if someone who might be armed was in the residence watching him.  Tr. at 27, 29-30.

One of Deputy Roe's zone partners, Deputy Moody, was dispatched to 120 Deep Lake Road.[6]  Tr. at 29.  Deputy Moody is a K-9 officer, and he had his dog with him on December 16, 2010.  Tr. at 13, 65.  Using direct radio communication, Deputy Roe made contact with Deputy Moody and gave him directions to the residence.  Tr. at 15-16.  Once Deputy Moody arrived at the scene, Deputy Roe updated him on the situation.  Tr. at 30. Deputy Roe told Deputy Moody that the house was not secured.  Tr. at 30.  Looking through the kitchen window, Deputy Roe showed Deputy Moody the lighted candle and the bowl with cereal and milk in it.  Tr. at 30.  Deputy Roe "may have mentioned" that he had smelled marihuana, and he wanted to see if Deputy Moody could smell it.  Tr. at 30.  The two deputies made the decision to enter the residence and informed the dispatcher they were going to enter.  Tr. at 30-31.  At that point, the dispatcher gave them "emergency radio traffic," meaning the only persons who were supposed to be using the designated channel were Deputies Roe and Moody and the dispatcher.  Tr. at 16.  This is done for officer safety in the event the deputies encounter an emergency situation while clearing a residence.  Tr. at 16.

According to Deputy Roe, the main factor in deciding to enter the residence and clear it was concern for the safety of the homeowner and others, as well as concern for the

---

[6]        Deputy Roe explained that Deputy Moody was dispatched because Deputy Roe's other zone partner "was on a signal 13, which is a suspicious vehicle, and could not respond."  Tr. at 13.

property.  Tr. at 41.  The smell of marihuana was another factor but not the deciding factor.
Tr. at 41.

The deputies announced their presence by shouting, "Sheriff's Office. Come out and
make yourself known."  Tr. at 33.  They did this several times.  Tr. at 33.  There was no
response.  Tr. at 33.  The deputies then entered the residence through the unsecured
master bedroom door.  Tr. at 31, 33; see Gov.'s Ex. 3D (photograph of master bedroom
area).  Deputy Moody's dog remained in Deputy Moody's patrol car and did not enter the
residence.  Tr. at 65.  The plan was to search or clear one room at a time.  Tr. at 32.  The
deputies were searching for people and only searched where people could hide; Deputy Roe
confirmed they were not "going through any drawers or rifling through anything like that[.]"
Tr. at 32, 33.

In clearing the master bedroom, Deputy Roe observed another lighted candle.  Tr. at
31-32.  Deputy Roe believes he and Deputy Moody tried to turn on the light in the master
bedroom closet, but there was no power in the residence.  Tr. at 70.  There was no one in
the master bedroom, bath, or closet.  Tr. at 33.

The deputies moved from the master bedroom into a hallway leading to the kitchen
and dining room area.  Tr. at 31, 33-34; see Gov.'s Ex. 3E (photograph of kitchen).  On the
kitchen table, Deputy Roe observed the cereal bowl he had previously seen through the
window.  Tr. at 35.  The bowl contained what Deputy Roe described as something "kind of
like a pound cake" and milk.  Tr. at 35; see Gov.'s Ex. 3F (photograph of kitchen table).
Deputy Roe smelled the contents of the bowl, and it smelled fresh.  Tr. at 36.  "[T]he house
appeared to be in disarray": the kitchen counters were littered with trash and some

cupboards were open.  Tr. at 35, 40; <u>see</u> Gov.'s Ex. 3E.  Past the island in the kitchen was the living room.  Tr. at 34.  In the living room, near the fireplace, there was a plastic tub containing "chemicals and stuff[.]"  Tr. at 37.  At the far end of the living room, Deputy Roe saw a ladder.  Tr. at 35-36, 38; <u>see</u> Gov.'s Ex. 3E.  The ladder led to a loft.  Tr. at 35-36, 38.

Deputy Roe climbed the ladder into the loft because the loft was a big enough space in which someone could hide.  Tr. at 38-39.  Deputy Roe described it as an "actual room." Tr. at 39.  There was a window in the loft, but it was covered with a black trash bag.  Tr. at 39.  A table was in the middle of the room, and on the table were small pots with marihuana stems growing in them.  Tr. at 39.  A broken ultraviolet light was hanging from the ceiling. Tr. at 39.  Based on his observations, Deputy Roe concluded that someone had been trying to grow marihuana in the loft area.  Tr. at 39.

Deputy Roe and Deputy Moody searched the other rooms in the residence for anyone hiding or injured. Tr. at 37-38.  There was an empty room containing flattened cardboard boxes.  Tr. at 37.  There were sparsely furnished bedrooms toward the back of the house. Tr. at 37-38.  There was also a utility room.  Tr. at 38.  The deputies did not find anyone in the house.  Tr. at 35-38.

As Deputy Roe and Deputy Moody walked through the residence, the smell of marihuana was only evident in the master bedroom area.  Tr. at 38.  The deputies exited the residence through the master bedroom door, the same door through which they had entered. Tr. at 41.  As they walked through the master bedroom towards the door, Deputy Moody saw a cardboard box on top of a dresser.  Tr. at 41.  Inside the box were at least fifty (50) "little pea pods" containing marihuana stems and roots.  Tr. at 41.  After the deputies left the

residence, they notified the dispatcher that everything was clear and that there was a marihuana grow in the residence.  Tr. at 41-42.  Deputy Roe called his lieutenant, George Traber, and essentially reported the same information to him.  Tr. at 42.  About an hour later, narcotics detectives arrived at the premises to investigate the marihuana grow operation. Tr. at 42, 48.

After advising the dispatcher and his lieutenant of the situation and while waiting for the narcotics detectives to arrive, Deputy Roe walked to the back of the property, down to the dock to make sure no one was there.  Tr. at 42.  He had to hop over a fence that surrounds the house to get to the back of the property.  Tr. at 42-43.  Evidently, after Deputy Moody exited the residence, he walked to the barn area on the north side of the property. Tr. at 42, 43-44.  The barn was approximately twenty (20) yards from the house.  Tr. at 69. Past the barn was a wooded area.  Tr. at 44.  As Deputy Roe returned from the back of the property, Deputy Moody asked him to come to the back of the barn.  Tr. at 44.  Deputy Roe obliged.  Tr. at 44.  Although there is a fence around part of the barn, Deputy Roe did not have to jump it because there was an opening that permitted him to walk through it.  Tr. at 46-47.  There is also a chain-link fence between the front of the barn and the house that Deputy Roe did not have any occasion to pass through.  Tr. at 46-47; see reproduction of Gov's Ex. 6 above.

Deputy Roe described the barn as looking like a huge stable.  Tr. at 44.  He knew from being on the property a couple of years earlier there were horses on the property, and he said that on December 16, 2010, he observed horse droppings.  Tr. at 44.  The dumpster was in the driveway in front of the barn.  Tr. at 44.  Deputy Roe and Deputy Moody met on

the west side of the barn near a side door.  Tr. at 45.  Deputy Moody told Deputy Roe to put

his nose near the crack of the door, because Deputy Moody smelled the odor of marihuana

coming from inside the barn.  Tr. at 45.  Deputy Roe did so, and he also smelled the odor

of marihuana.  Tr. at 45.  At some point, Deputy Moody deployed his drug detecting dog, and

the dog alerted to the barn door area.  Tr. at 45-46.  Even though the drug detecting dog

alerted to the barn door area, apparently no law enforcement officers entered the barn until

after a search warrant for the barn and house was obtained much later in the day.  Tr. at 69.

In addition to detecting the smell of marihuana at the side door, Deputy Roe observed

what he called a "water system" on the side of the barn.  Tr. at 45, 46, 88.  It apparently was

fairly large and was protected by an overhang.  Tr. at 45, 46.  It had a huge tank and a lot

of PVC pipes coming out of it.  Tr. at 46.  Deputy Roe testified that he had never seen

anything like it before.  Tr. at 46.

Eventually narcotics detectives Josh Lee and Tim Campbell arrived at the residence.

Tr. at 48.  Deputies Roe and Moody explained to them what had transpired.  Tr. at 48. Based

on the information provided to the detectives, a search warrant was later obtained to search

the house and the barn.  Tr. at 48-49; see Gov.'s Ex. 2 (search warrant).  Deputy Roe did

not participate in obtaining the search warrant, and he did not participate in the execution

of it.  Tr. at 49-50. He did, however, remain on the scene, along with his lieutenant, who

arrived at the premises after the narcotics detectives.  Tr. at 49.

When Lieutenant Traber arrived, he looked at a power pole in front of the house and

believed that electricity was somehow being diverted.  Tr. at 49.  Clay Electric was then

contacted, and Clay Electric employees responded to the residence and met with Lieutenant

Traber and Deputy Roe.  Tr. at 49-50.  Clay Electric employees found a line coming off the main power line running down the pole to the ground; the line was buried underground and ran to the barn.  Tr. at 49; see Gov.'s Exs. 4A, 4B, 4C (photographs of power line and extra line).  Coincidentally, a Clay Electric representative had been out to the property earlier in the day to check the meter and apparently did not notice the extra line running down the pole.  Tr. at 50-51.  Deputy Roe overheard Clay Electric employees talking to the narcotics detectives.  Tr. at 50-51.  The Clay Electric employees said they had never seen anything like it.  Tr. at 51.  Whoever diverted the power was stealing electricity.  Tr. at 51.  The diversion line was buried underground in pipes, and the line ran all the way under the foundation of the barn.  Tr. at 51.  According to the electric company employees, the person who diverted the power knew what he or she was doing.  Tr. at 51.

When Lieutenant Traber and the Clay Electric employees first began their inspection of the power pole, the extra line running from the main line was visible on the side of the pole leading to the ground.  Tr. at 53, 56.  The underground piping system was not exposed.  Tr. at 56.  Detective Campbell and the electric company employees dug up the ground exposing the pipe running to the barn.  Tr. at 56; see Gov.'s Ex. 4D (photograph of Detective Campbell manipulating power line).

At some point after the narcotics detectives arrived, Deputy Roe walked behind the barn.  Tr. at 54-55.  He was just checking the rest of the property, and he did not know if anyone was back there.  Tr. at 55-56.  He observed huge holes that appeared to have been dug with a tractor or backhoe.  Tr. at 54; see Gov.'s Exs. 5A-5D (photographs of holes).  There were numerous wires, fans, ultraviolet lights, and trash associated with growing

marihuana in the holes.  Tr. at 54.  Some of the holes were covered with pieces of wood and a blue tarp in an apparent attempt to conceal the equipment in the holes.  Tr. at 54-55. According to Deputy Roe, a number of items, fans, wiring and lights, were not concealed and were in plain view.  Tr. at 55.

Although Deputy Roe was working a 6:00 a.m. to 6:00 p.m. shift, he stayed on the premises until the search warrant arrived and until the officers executing the search warrant entered the barn.  Tr. at 69-70.  Deputy Roe believes that happened about 8:00 p.m.  Tr. at 69.

## B.  Det. Lee

Det. Lee has been with the Putnam County Sheriff's Office for about three (3) years, and he is presently assigned to the drug and narcotics unit.  Tr. at 77-78.  He has been in that unit for almost two (2) years.  Tr. at 78.  His duties include working drug investigations and doing undercover work.  Tr. at 78.  As part of his duties as a law enforcement officer, Det. Lee has investigated indoor and outdoor marihuana grows.  Tr. at 82.  This has included finding marihuana grows and dismantling them.  Tr. at 82.  Based on his training and experience, he is familiar with the smell of growing marihuana.  Tr. at 82.

Det. Lee was on duty on December 16, 2010.  Tr. at 78.  He received a call that day to respond to 120 Deep Lake Road.  Tr. at 78.  Det. Campbell, another member of the narcotics unit, was with him when he received the call and accompanied him to the Deep Lake Road property.  Tr. at 78-79.  While en route, the detectives were advised by Deputy Roe via telephone that in the course of checking the property, he smelled marihuana and observed a marihuana grow.  Tr. at 79-81.

When the detectives arrived at the 120 Deep Lake Road property, the gate to the fence was closed, but to one side of the gate the fence was broken down. Tr. at 80. It appeared the fence had been hit from the inside of the property toward the outside. Tr. at 80. The detectives drove onto the property through the broken fence, continued a short distance on the dirt driveway, came to an open chain-link fence, and drove through the opening onto a paved driveway. Tr. at 80. They parked just inside the second fence. Tr. at 80. Det. Lee could see a large outbuilding to his right and the residence to his left. Tr. at 81. They were a lot closer to the outbuilding, about ten (10) to fifteen (15) yards from it. Tr. at 82. Det. Lee could smell the faint odor of raw marihuana as soon as he exited his vehicle. Tr. at 82.

The detectives made contact with Deputy Roe. Tr. at 81. He reiterated what he had told the detectives on the phone, and he mentioned something about a power pole and a blown transformer. Tr. at 81. Det. Lee recalls Deputy Moody being on the scene, along with others. Tr. at 81. He could not recall the others who were present. Tr. at 81.

After discussing matters with Deputy Roe, the detectives walked in the direction of the outbuilding to determine exactly from where the odor of marihuana was coming. Tr. at 82-83. As Det. Lee moved closer to the outbuilding, the odor of marihuana got stronger. Tr. at 82. Next to the building near the eves and the access doors, the odor of marihuana was much stronger. Tr. at 82-83.

On the right side of the outbuilding, Det. Lee observed an elaborate water pump system. Tr. at 88. There were PVC pipes running from the pump to the outbuilding. Tr. at 88. According to Det. Lee, there was no need for this type of water system other than to

grow marihuana.  Tr. at 88.  Based on his training and experience, he knows that marihuana grows need a water supply for the plants to grow.  Tr. at 88-89.

Behind the outbuilding, Det. Lee observed dirt mounds and trash.  Tr. at 83.  He and Det. Campbell decided to take a closer look and walked out to the area where the mounds were.  Tr. at 83.  In walking to the area, the detectives did not have to walk through a fence or gate.  Tr. at 84.  Once they were closer to the mounds, they observed different pits had been dug, and the pits contained wiring, lighting, including ballasts lights, and different construction material.  Tr. at 83-86.  Det. Lee also observed a large container buried in the ground.  Tr. at 85; see Gov.'s Ex. 5D (photograph of container). According to Det. Lee, these items were immediately visible to anyone walking around the property.  Tr. at 84.  Det. Lee testified, based on his experience, that electrical wiring and lights are used to grow marihuana.  Tr. at 85.

Det. Lee and other law enforcement officers conversed with Clay Electric employees about the power pole in front of the residence.  Tr. at 86-87.  One employee pointed to a mechanism on the pole and said the mechanism was a means to divert power.  Tr. at 87.  According to the employee, this mechanism was not placed on the pole by Clay Electric.  Tr. at 87.  Det. Lee also observed an extra line coming down the power pole into the ground.  Tr. at 87-88.  The extra line ran underground from the pole to the side of the outbuilding.  Tr. at 87-88.

After the detectives made these various observations, Det. Campbell contacted Det. Stallings, who was then a narcotics detective, and asked him if he would seek authorization for a search warrant based on the totality of the information the detectives had learned from

Deputy Roe and from their own observations.  Tr. at 89-90.  All of this information was relayed by Det. Campbell, in Det. Lee's presence, via cellular telephone to Det. Stallings.  Tr. at 90.  Det.  Lee and Det. Campbell waited on the property until the search warrant arrived.  Tr. at 90.  Det. Lee did not recall how much time passed before Det. Stallings arrived with the search warrant, but it was at least a couple of hours.  Tr. at 90-91.  Det. Lee had to leave the premises before the search began, and by the time he returned,  the search was underway.  Tr. at 91.  When questioned about the timing of the search of the outbuilding, Det. Lee stated that he believes the outbuilding was not entered until the search warrant was received.  Tr. at 92.

## C. Sgt. Stallings

Sgt. Stallings has been employed with the Putnam County Sheriff's Office for about ten (10) years.  Tr. at 93.  He is currently a sergeant in the patrol division.  Tr. at 93-94.  He assumed that position on February 21, 2011.  Tr. at 94.  Prior to becoming a sergeant, he was a member of the narcotics unit for a little more than one (1) year.  Tr. at 94.

In the mid to late afternoon of December 16, 2010, while working in the narcotics unit, then-Det. Stallings received information via telephone from Detectives Tim Campbell and Josh Lee about an indoor marihuana grow at 120 Deep Lake Road in Melrose, Putnam County, Florida.  Tr. at 94-95, 98.  The marihuana grow had been discovered by the patrol division.  Tr. at 94-95.  When Detectives Campbell and Lee called Det. Stallings, they were with the patrol deputy who had arrived at the scene earlier and had discovered the grow.  Tr. at 94-95.  Det. Stallings was at his office in Palatka.  Tr. at 95.  Detectives Campbell and Lee wanted Det. Stallings to draft an affidavit in application for a search warrant for the 120

Deep Lake Road premises.  Tr. at 94-95.  As Detectives Campbell and Lee provided information to Det. Stallings, Det. Stallings put the information in an affidavit.  Tr. at 95, 96. Det. Stallings was informed the fence had been broken outward, but he could not recall who advised him of this and at what point in his discussions with the detectives he learned it.  Tr. at 99-100.  Det. Stallings did not consult with the sheriff's office attorney prior to or during the preparation of the affidavit and search warrant application.  Tr. at 99.

Det. Stallings explained during cross examination that he was attempting to convey in the affidavit that the deputies were responding to a suspicious incident at the property and had "a well-founded fear there may [have been] a medical emergency on the premises[.]" Tr. at 100.  Det. Stallings characterized the situation as involving a potential "patient" at least five times in the affidavit.  Tr. at 100; see Gov.'s Ex. 2 (search warrant and affidavit).

After he completed the affidavit, Det. Stallings took it to Putnam County Judge Peter T. Miller.  Tr. at 96.  About two (2) hours elapsed between the time Det. Stallings received the telephone call from his colleagues and when he was able to see Judge Miller.  Tr. at 96-97. Although not completely sure, Det. Stallings believes he met Judge Miller at Judge Miller's house.  Tr. at 97.  Det. Stallings was placed under oath and swore that the information in the affidavit was true and accurate.  Tr. at 97.  Thereafter, Judge Miller issued the search warrant authorizing the search of 120 Deep Lake Road, including the residence, the outbuildings, the curtilage, and the other items listed in the search warrant.[7]  Tr. at 97.

---

[7]       A certified copy of the affidavit and application for the search warrant and the search warrant were received into evidence as Government's Exhibit 2.  Some of the facts in the affidavit are inconsistent with or contradict the facts that were developed at the suppression hearing.  This is discussed in the Analysis section below.

Det. Stallings was asked on cross examination whether the practice is to take a search warrant application to a duty judge or to whatever judge may be available.  Tr. at 101. Det. Stallings testified that the judges use an "on-call" system, but he could not say whether Judge Miller was on-call on December 16, 2010.  Tr. at 101.  By "on-call" Det. Stallings was referring to a duty judge system.  Tr. at 101.  Det. Stallings thought two judges were in the process of retiring, and Judge Miller was closest in proximity to Det. Stallings.  Tr. at 101-02.

After the search warrant was issued, Det. Stallings took the warrant to 120 Deep Lake Road.  Tr. at 97.  Law enforcement officers then executed the warrant.  Tr. at 97.  The outbuilding or barn had not been searched prior to Det. Stallings' arrival with the search warrant.  Tr. at 99.

### III.  Summary of Arguments

In the Motion, Defendant seeks to suppress "[o]ne [h]undred and [s]ixty [e]ight (168) marihuana plants, seized on 12/16/10, from [D]efendant's residence and/or out-building adjacent to the residence[.]"  Motion at 1.  Defendant argues in the Motion that "[t]he probable cause for the search [warrant] was based on a prior illegal entry into [D]efendant's residence and curtilage earlier that day by deputies from the Putnam County Sheriff's Office."  Id.  In Defendant's Memorandum, Defendant contends there were no exigent circumstances justifying the initial warrantless entry of the residence: "no blood trail, moans, sobbing, piled up mail, cries, 911 calls, or smells emanating from the residence" and "no vehicles at the fence or at the house."  Defendant's Memorandum at 1.  According to Defendant, there was "no evidence anyone was [on the property.]"  Id.  As to the area outside the barn, Defendant asserts that "[t]he barn is part of the curtilage, not in the open

fields"; thus, the search of that area was not an "'open fields search.'"  Id. at 2 (citation omitted).  According to Defendant, the officers were trespassing on his property when they "walked all around the curtilage finding pits, electrical conduits, and the smell of marijuana emanating from the garage."  Id.

Defendant argues that the illegal search of the residence and curtilage cannot be saved by law enforcement officers subsequently obtaining a search warrant: "[t]he search with the warrant was tainted by the illegal and prolonged entry to the residence followed by an intrusive trespassing."  Id.  While Defendant recognizes "the obtaining of the warrant is some evidence of good[]faith," he contends "there was no independent source or attenuation between the flagrant illegality by the police and the discovery of the evidence."  Id.  The evidence presented to the judge to obtain the warrant, asserts Defendant, "is the same evidence as obtained in the illegal burglary and trespass of [Defendant's] house and curtilage."  Id.  Defendant claims that because there was no independent or intervening source,  "[t]he evidence obtained from the search of the barn/garage is/was a derivative of an illegality or 'fruit of the poisonous tree.'"  Id. at 2-3.

Reading the Response and the Government's Supplemental Response together, the Government argues the initial search of the residence was objectively reasonable because of exigent circumstances.[8]  Response at 6; Government's Supplemental Response at 3.  According to the Government, "the officers . . . entered the residence out of concern that there may be individuals in need of aid and out of concern that the residence, if left

---

[8] As noted above, the Response was filed prior to the suppression hearing.  The facts relied upon by the Government in outlining its legal position in the Response appear to come from the search warrant affidavit of Det. Stallings.  The facts developed at the hearing are more comprehensive than those facts and in a number of ways are inconsistent with those facts.

unsecured, could be subject to damage." Government's Supplemental Response at 3.  The Government asserts that "[t]o invoke the emergency aid exception, officers do not need ironclad proof of a likely serious, life threatening injury."  Id. (citation omitted).[9]

Addressing whether the deputies and narcotics detectives walking around the outbuilding area constituted a Fourth Amendment violation, the Government argues "[D]efendant had no expectation of privacy in the area around the outbuilding[.]"  Id. at 4. According to the Government, "the outbuilding or barn was located approximately 20 yards from the residence and was not enclosed by a fence.  The fence surrounding the entire property had been destroyed, the interior fence near the outbuilding was open, and there was no evidence that steps had been taken to protect the area from observation by others lawfully on the property."  Id.

Arguing in the alternative, the Government asserts that even if the initial entry into the residence was improper, the affidavit contained sufficient information about the outside of the residence to establish probable cause for the judge to have issued the warrant. Id. at 4-5.  That is, if information in the affidavit about what the officers observed inside the residence were stricken from Det. Stallings' affidavit, the remaining information about the outside of the building learned from the law enforcement officers was sufficient to establish probable cause for the residence and barn.[10]  Id.

---

[9]      In the Response, the Government focuses on the so-called "community care taking" functions of police officers.  In the Government's Supplemental Response, the focus is on an exception to the warrant requirement based upon exigent circumstances; that is, the "emergency aid exception."  These are discussed in more detail in the Analysis section.

[10]      The Government's Supplemental Response refers to the observations of "[t]he officers" in discussing the information learned about the outside of the residence and reported to the judge in Det. Stallings'
(continued...)

Finally, the Government relies on the good faith exception to the exclusionary rule articulated in <u>United States v. Leon</u>, 468 U.S. 897 (1984).  Government's Supplemental Response at 5-6.  The Government contends "that the officers did not commence their search until the search warrant was obtained" and were "entitled, in good faith, to rely upon Judge Miller's finding that probable cause existed[.]"  <u>Id.</u> at 6.

## IV.  Analysis

The undersigned first addresses whether exigent circumstances permitted the warrantless entry into the residence.  Next, the undersigned addresses whether the barn was part of the curtilage of the home.  Although Defendant does not specifically challenge whether there was probable cause to support the issuance of the warrant, he does point out an allegedly misleading statement in the warrant affidavit.  In addition, the facts developed at the suppression hearing differ in a number of respects from those in the affidavit.  Therefore, the undersigned addresses whether probable cause supported the issuance of the search warrant.[11]

### A.  Exigency

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures.  <u>See</u> U.S. Const. amend. IV.  "Of all the places that can be searched by the police, one's home is the most sacrosanct, and receives the greatest Fourth Amendment protection."  <u>United States v. McGough</u>, 412 F.3d 1232, 1236 (11th Cir.

---

[10](...continued)

affidavit.  Government's Supplemental Response at 4.  A review of the affidavit, however, reveals that the only officer to whom information about the barn area is attributed is Det. Campbell.  <u>See</u> Gov.'s Ex. 2.

[11]        The Government concedes Defendant "has standing to challenge the search of the property located at 120 Deep Lake Road, Melrose, Florida."  Response at 4; <u>see also</u> Tr. at 5.

2005) (citing Payton v. New York, 445 U.S. 573, 585 (1980); Kyllo v. United States, 533 U.S. 27, 31 (2001)).  For this reason, "'searches and seizures inside a home without a warrant are presumptively unreasonable.'" McGough, 412 F.3d at 1237 (quoting Payton, 445 U.S. at 586).

While presumptively unreasonable, the "prohibition against warrantless searches is not . . . absolute." McGough, 412 F.3d at 1237.  Indeed, a "well-recognized exception applies when 'the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'" Kentucky v. King, — U.S. —, —, 131 S. Ct. 1849, 1856 (2011) (alteration in original) (quoting Mincey v. Arizona, 437 U.S. 385, 394 (1978)).  One such recognized exigency has been characterized as the "'emergency aid' exception," which permits officers to enter a home without a warrant "'to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" King, 131 S. Ct. at 1856 (quoting Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) and citing Michigan v. Fisher, — U.S. —, —, 130 S. Ct. 546, 548 (2009) (per curiam)); see also United States v. Holloway, 290 F.3d 1331, 1337 (11th Cir. 2002) (holding that "emergency situations involving endangerment to life fall squarely within the exigent circumstances exception" and approving warrantless entry into a home "[w]hen the police reasonably believe an emergency exists which calls for an immediate response to protect citizens from imminent danger").  The subjective intent of law enforcement officers and the seriousness of any possible crime they may be investigating are irrelevant under this exception; rather, for the exception to apply, there need only be "an objectively reasonable basis for believing . . . that a person within [the house] is in need of

immediate aid[.]" <u>Fisher</u>, 130 S. Ct. at 548 (alteration in original) (quotation and citation omitted); <u>see also</u> <u>McGough</u>, 412 F.3d at 1237 (stating officers may enter and search a home without a warrant "'when they reasonably believe that a person within is in need of immediate aid'") (quoting <u>Mincey</u>, 437 U.S. at 392).  The Government bears the burden of proving an exigency exception to the warrant requirement.  <u>See</u> <u>McGough</u>, 412 F.3d at 1237 n.4 (citations omitted).

In <u>United States v. Tibolt</u>, 72 F.3d 965, 967-68, 969-71 (1st Cir. 1995), the United States Court of Appeals for the First Circuit was presented with facts comparable to those in the instant case.  There, the court considered, <u>inter alia</u>, whether there were exigent circumstances permitting officers to enter a house when an alarm had been set off and police were called by the security alarm company because the company could not make contact with anyone at the house.  <u>Id.</u>  The facts of <u>Tibolt</u> are as follows.

The first dispatched officer mistakenly entered the wrong driveway and proceeded to the wrong house.[12]  <u>Id.</u> at 967.  Upon arriving at the house, the officer "checked the exterior of the residence for signs of an attempted break, or burglary in progress."  <u>Id.</u>  Finding "no signs of forced entry," he proceeded to check the door on the rear deck, which was unlocked.  <u>Id.</u>  The officer opened the door and announced his presence but did not receive a response.  <u>Id.</u>  Under the circumstances, the officer "reasoned that the alarm might not have been activated accidentally."  <u>Id.</u>

---

[12]     In the end, the First Circuit did not find this mistake to be a basis for suppressing evidence, <u>Tibolt</u>, 72 F.3d at 970-71, and the analysis regarding this mistake is not pertinent to the issues in the instant case.

The officer called for backup. Id. Another officer arrived within five (5) minutes, and he also entered the wrong driveway and proceeded to the wrong house because he saw the first officer's patrol car parked next to the wrong house. Id. The second officer "immediately recognized the . . . residence as having been the target of a prior investigation by a . . . drug task force in which he had participated." Id. However, he was not sure whether the house was still owned by the "target" of that investigation or whether the house was still under investigation. Id.

The two officers "decided to make an immediate warrantless entry through the unlocked rear door, then looked about for possible explanations for the alarm (e.g., any occupants, a burglar, 'whatever')." Id. The officers did not look in "drawers, cabinets and containers." Id. After securing each room and finding no occupants or intruders, "the officers discovered a well-established marijuana growing facility in the basement, then left to obtain a search warrant." Id. The officers returned with a search warrant and "seized incriminating financial records" which were the subject of a later suppression motion. Id. at 967-68. In the motion, the defendant argued that the "warrant was invalid because the evidence relied on in the supporting affidavit was itself the fruit of the earlier warrantless search." Id. The district court denied the motion to suppress, and the defendant appealed. Id. at 968.

Finding that the first officer "was presented with 'exigent circumstances' permitting an immediate warrantless entry," the First Circuit upheld the initial search (despite the fact that officers had mistakenly entered the wrong house). Id. at 970-91 (emphasis in original). In doing so, the court focused on the following facts: (1) the alarm had been activated and the

-27-

security company placed a call to the residence but received no answer, which would weigh against an inadvertent activation by the resident of the house; and (2) when the officer arrived about ten minutes after the security company called police, he checked all windows and doors, but "[i]nstead of finding all doors secured, as one might reasonably expect while the residents are away, he found an unlocked door on the rear deck and received no response to his efforts to communicate with anyone who might be inside. These circumstances significantly enhanced the likelihood of an intruder." Id. at 970. In reasoning that exigent circumstances were present and the warrantless entry was justified, the court explained that "[w]ithout entering, [the officer] could not know but what an intruder had managed to get into the residence, and even injured or captured a resident, then fled; or had been caught off guard by the police and remained in the residence with a forcibly detained resident." Id. The court recognized that "[h]indsight" revealed the officer "was mistaken" but stated that "*at the time*, . . . an officer confronted with these circumstances reasonably could have concluded that there was an imminent risk 'to the lives or safety of the public' . . . or to an injured or immobilized resident." Id. at 971 (emphasis in original) (citations omitted).

Here, Defendant suggests that the lack of a "blood trail, moans, sobbing, piled up mail, cries, 911 calls, or smells emanating from the residence," combined with the lack of vehicles at the house, demonstrates there was "no evidence anyone was [on the property]." Defendant's Memorandum at 1. The undersigned disagrees and finds the circumstances were such that it was objectively reasonable for the officers to believe someone in the residence was in need of immediate aid.

Deputy Roe was advised by the dispatcher that a "criminal mischief complaint" had been called in by a neighbor and that the situation appeared significant or suspicious.  Upon arriving at the property within about thirty (30) minutes, Deputy Roe observed that the gate had been "rammed" and "smashed down" from the inside of the property.  There were no vehicles in sight.  These circumstances viewed objectively would strongly suggest evidence of someone (whether it be an intruder, a resident or residents trying to get away from an intruder, or someone else) leaving in a hurry and forcibly.

In an attempt to determine whether the house had been burglarized and to see whether anyone was in need of assistance, Deputy Roe looked in windows and checked the doors.  He saw a lighted candle, which viewed objectively would tend to suggest a resident was inside.  He also saw what he believed to be a bowl of cereal with milk on the table, which viewed objectively would suggest a resident was inside.  Finally, he saw trash strewn about the kitchen counter, which viewed objectively could suggest there had been some sort of altercation or disturbance.

Upon knocking at the front door, he received no answer.  When he checked the windows and doors, he realized one door was unlocked.  Though he found no signs of forced entry, his discovery that a door was unlocked objectively could have suggested someone was inside.  Cf. Tibolt, 72 F.3d at 967, 970.  Deputy Roe called for backup, and when the backup deputy arrived, the two decided to enter the residence.  Before they did so, they shouted "Sheriff's Office.  Come out and make yourself known."  There was no response.  Combined with the other factors, which viewed objectively suggested someone could have been inside, the lack of response to their command lends further support for the

-29-

conclusion that it was reasonable to believe someone could be inside and unable to respond, thus in need of immediate aid.  Cf. id. at 970.  Just as in Tibolt, without going inside, the officers could not have known whether "an intruder had managed to get into the residence, and even injured or captured a resident, then fled; or had been caught off guard by the police and remained in the residence with a forcibly detained resident."  Id. at 970.

Viewing the totality of the circumstances, the undersigned concludes that it was objectively reasonable for officers to believe someone was in need of immediate aid, and therefore they were permitted to enter the home without a warrant for the purpose of looking for that individual.[13]  See McGough, 412 F.3d at 1237 (citation omitted).  That Deputy Roe smelled marihuana when he opened the door, and that he admitted the smell was "another factor but not the deciding factor" contributing to his decision to enter the residence, are of

---

[13]     In the instant case, the undersigned focuses not on the "community caretaking functions" of police in general, but on the recognized emergency aid exception.  Some circuits have acknowledged that "community caretaking functions" of police officers can permit a warrantless entry into a private home.  The "community caretaking functions" of police officers have been described "as those actions by police officers that are 'totally divorced from the protection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'"  McGough, 412 F.3d at 1237 (quoting United States v. York, 895 F.2d 1026, 1030 (5th Cir. 1990)).  Courts vary in how they view the community caretaking functions: some appear to view them as a subset of the exigency exception to the warrant requirement, some view them as related to or intertwined with officers rendering emergency aid (which is also a subset of the exigency exception), and some view them as entirely separate from both the exigency exception and from the emergency aid exception.  Cases referring to community caretaking functions in the context of residential searches generally do not have underlying facts involving police officers rendering emergency assistance to injured occupants or protecting them from imminent injury; rather, the cases appear to focus on other functions of law enforcement such as, among other things, keeping the peace and responding to and investigating concerns of citizens.  See, e.g., York, 895 F.2d at 1027-31 (finding police had a "right" to "enter[] only the first room of the dwelling" as "peacekeepers" when police were led into the home by a man who had been staying there with the consent of the owner – who was intoxicated and belligerent – so the man and his family could gather and remove their belongings peacefully); United States v. Nord, 586 F.2d 1288, 1289-91 (8th Cir. 1978) (finding police were lawfully "on the premises as part of their routine community caretaking functions" when a "concerned" individual called police after finding the defendant intoxicated in the residence, but noting the functions "include responding to calls to assist persons in need of immediate aid," and agreeing that "the situation confronting the officers had certain emergency features").  The Eleventh Circuit has "never explicitly held that the community caretaking functions of a police officer permits the warrantless entry into a private home," but it has recognized that other circuits allow warrantless entries based upon the "community caretaking functions" of police officers.  McGough, 412 F.3d at 1237-38.

no consequence because the subjective intent of law enforcement officers and the seriousness of any possible crime they are investigating are irrelevant.  See Fisher, 130 S. Ct. at 548 (quotation and citation omitted).

Once inside, the officers looked only in places where people could be found.  They did not look in drawers or rifle through anything.  They saw that the house was in disarray. Still looking for individuals, Deputy Roe climbed a ladder to a loft area, where he saw small pots with marihuana stems, a broken ultraviolet light hanging from the ceiling, and the window was covered with a black trash bag.  The deputies cleared the house and found no one.  As they were exiting the same door through which they entered, they observed a cardboard box on top of a dresser in which at least fifty "little pea pods" containing marihuana stems and roots were found.

The Government has carried its burden of proving an exigency exception to the warrant requirement.  The odor of marihuana emanating from the residence and all of the observations made in the residence occurred while the officers were lawfully permitted to enter and look for individuals in need of immediate aid.

**B.  Curtilage vs. "Open Field"**

The Government contends that "[w]hether the officer's actions in walking around the property after exiting the residence was a Fourth Amendment violation depends on whether [D]efendant had a reasonable expectation of privacy in the curtilage."[14]  Government's Supplemental Response at 3.  While the Government labels the barn and the contents

---

[14]    The Government does not argue for an extension of the exigency permitting the officers to walk around and "clear" the rest of the property for possible intruders or for people in need of immediate aid.

surrounding the barn as "curtilage," it is evidently advancing a theory that the barn was <u>not</u> part of the home's curtilage, and therefore Defendant had no reasonable expectation of privacy in this regard.  <u>See</u> <u>id.</u> at 3-4.  Defendant, of course, contends just the opposite. Defendant's Memorandum at 2.

It is well-established that the Fourth Amendment "protects the curtilage of a house" from intrusion by law enforcement.  <u>United States v. Dunn</u>, 480 U.S. 294, 300 (1987) (citation omitted).  When courts are confronted "with the task of defining the extent of a home's curtilage," the United States Supreme Court has identified four factors that courts should consider: "the proximity of the area claimed to be the curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by."  <u>Id.</u> at 301 (citations omitted).  <u>Dunn</u> was a case in which the Court discussed whether a barn was part of a home's curtilage and ultimately found that it was not.  <u>Id.</u>  The <u>Dunn</u> factors are addressed in turn.

First, the barn here was approximately twenty (20) yards from the home, which, while less than the fifty (50) yards away than was the barn in <u>Dunn</u>, weighs against it being part of the home's curtilage.  <u>See</u> <u>Hearn v. Florida</u>, 410 F. App'x 268, 272 (11th Cir. Jan. 21, 2011) (unpublished) (finding a shed was not part of a home's curtilage when, among other factors, it "was situated about 20 yards behind [the] house, behind a camper trailer, and about 10 yards behind the shed was a wooded area").  Second, as can be seen from Government's Exhibit 6 (the diagram included in the Summary of Evidence section, <u>supra</u>), a fence separated the house and the barn.  This factor too weighs against a finding that the

barn was part of the curtilage.  See Dunn, 480 U.S. at 302 (finding "significant that respondent's barn did not lie within the area surrounding the house that was enclosed by a fence").  Third, Deputy Roe knew that a couple of years earlier, the barn was used for housing horses, and on the date in question, he observed horse droppings, which would suggest horses were still kept in the barn.  Again, this weighs against a finding that the barn is part of the curtilage because Deputy Roe "possessed objective data indicating that the barn was not being used for intimate activities of the home."  Id.  Fourth and finally, there was no evidence that the fences on the property near the barn were designed to prevent people "from observing what lay inside the enclosed areas"; rather, much like in Dunn, at least one of the fences was described as a chain-link fence.  Id.  Also, while it is apparent there are two fences between the street and the barn, the first fence had been partially "smashed down," and the second fence was a chain-link fence and was open without a gate so cars could drive through on the driveway unimpeded.  Indeed, an employee from Clay Electric was obviously able to pass through the gates without issue, as he or she had been there reading the meter earlier that day.  Cf. United States v. Cousins, 455 F.3d 1116, 1123-24 (10th Cir. 2006) (in analyzing fourth Dunn factor, finding relevant that the defendants "knew the area was frequented by a meter reader who might be expected to report observed illegal activity").  While the fourth factor is indeed a close call, the undersigned finds that it also weighs against a finding that the barn was part of the curtilage of the home.

Having applied the Dunn factors, and having concluded each of them weighs against a finding that the barn was part of the curtilage of the home, the undersigned finds that the barn was not part of the curtilage.  Thus, the observations from near the barn and the odor

of marihuana emanating from the barn (as discussed in more detail below) were lawfully made and detected.

## C. Probable Cause for Search Warrant

"A magistrate's determination of probable cause should be paid great deference by reviewing courts." Illinois v. Gates, 462 U.S. 213, 236 (1983) (observing that "after-the-fact scrutiny by the courts of the sufficiency of an affidavit should not take the form of de novo review") (citation and internal quotation omitted); see also Ornelas v. United States, 517 U.S. 698-99 (1996).  Review of the sufficiency of the evidence supporting probable cause is limited to the information that was presented to the judicial officer who issued the warrant. Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 564-65 (1971). "Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (citation omitted). "[P]robable cause is a fluid concept–turning on the assessment of probabilities in particular factual contexts–not readily, or even usefully, reduced to a neat set of legal rules." Gates, 462 U.S. at 232.

Here, the officers lawfully entered the property based upon exigent circumstances described supra at section IV. A.  Once on the property and once the exigency subsided, Deputy Roe walked over to the barn (through an open gate), where he met Deputy Moody. The deputies observed an elaborate water system outside the barn.  They also smelled the odor of marihuana coming from the barn.  Deputy Moody later found the holes behind the barn containing wires, fans, ultraviolet lights, and trash associated with growing marihuana.

-34-

The lieutenant also found the extra power line.  As to the deputies' observations outside the barn, "standing as they were in the open fields, the Constitution did not forbid them" to observe the contents in the holes behind the barn and to observe the extra power line on the pole near the barn.[15] Dunn, 480 U.S. at 304.  Similarly, they were permitted to rely upon the recognized odor of marihuana emanating from the barn in forming probable cause for the search warrant.  Sometime thereafter, they applied for a search warrant.  The application included these facts (although attributed mostly to Detective Campbell), as well as the observations of Deputies Roe and Moody when they entered and secured the residence.

Defendant contends that law enforcement misled the judge who issued the warrant because "the warrant application never states that the crash of the fence was from inside out[.]" Defendant's Memorandum at 2.[16]  Defendant is correct that the affidavit authored by

---

[15]    Defendant does not take issue specifically with the fact that law enforcement apparently participated, at least to some degree, in digging up the piping connected to the extra power line.  See generally Motion; Defendant's Memorandum. Similarly, the Government ignores this fact in its papers.  See generally Response; Government's Supplemental Response.  It is unclear when the digging occurred– whether it was before or after the warrant was obtained.  While the warrant affidavit refers to an "electricity diverting device that had been installed by unknown persons" and states that a Clay Electric Technician was called to the scene, it does not mention any digging or anything that was dug up.  Gov.'s Ex. 2.  Nevertheless, Defendant does not seek to suppress this evidence and it obviously was not considered by Judge Miller in making the probable cause determination.  Further, it is noted that the piping was partially exposed without the digging.

[16]    There is "a presumption of validity with respect to the affidavit supporting the search warrant." Franks v. Delaware, 438 U.S. 154, 171 (1978).  In Franks, the Supreme Court determined that, under limited circumstances, a defendant is entitled to a hearing at which the defendant may attempt to show by a preponderance of the evidence that information in a warrant affidavit was intentionally or recklessly false.  Id. at 156.  If the defendant shows such falsity, and the affidavit fails to establish probable cause after putting the false information aside, the search warrant must "voided."  Id.  To be entitled to a Franks hearing, however, a defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit."  Id. at 155-56.  In making the preliminary showing required by Franks, a defendant's challenge to a warrant affidavit "must be more than conclusory and must be supported by more than a mere desire to cross-examine."  Id. at 171.  The defendant must identify the portions of the affidavit alleged to be false or omitted, allege deliberate falsehood or reckless disregard for the truth, and accompany those allegations with an offer of proof.  Id.  "Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained."  Id.  It is insufficient to allege negligence or innocent mistake, and "[t]he deliberate falsity or reckless
(continued...)

Sgt. Stallings does not include that the fence appeared to be damaged from the inside of the property.  See Gov.'s Ex. 2 (stating Deputy Roe "located the area of [the] fence and gate leading to a residence that appeared to have been damaged by a vehicle").  However, the affidavit also states that "only the damaged property remained as the vehicle responsible for the destroyed portion of fencing had already left the area."  Id.  It can reasonably be inferred from this sentence that the damage had occurred from the inside of the property.  Thus, Sgt. Stallings did not mislead the judge issuing the warrant.  In any event, the omission of the direct fact that the fence was damaged from the inside of the property was not material to the probable cause determination.  Cf. United States v. Kirk, 781 F.2d 1498, 1505 n.9 (11th Cir. 1986) (alternatively "assuming that the misstatements . . . were made either intentionally or with reckless disregard for the truth, it is clear that those statements were not material to the probable cause determination").

Although not raised by Defendant, the undersigned notes that the facts supporting the application for the warrant differ in other respects from the testimony at the suppression hearing.  First, the affidavit states that Deputy Roe waited for Deputy Moody prior to opening the door, and when Deputy Moody arrived, officers opened the front door.  The testimony at the hearing was that Deputy Roe opened the master bedroom door prior to Deputy Moody's arrival and the front door was locked.  Second, the affidavit states that the two (2) deputies "were immediately overwhelmed by the strong smell of cannabis permeating from the interior of the residence," but the testimony at the hearing was that Deputy Roe smelled

---

[16](...continued)
disregard whose impeachment is permitted . . . is only that of the affiant, not of any nongovernmental informant."  Id.  Here, Defendant does not seek a Franks hearing, but he does contend the judge issuing the warrant was misled.

a strong odor of fresh marihuana.  Third, the affidavit states that the two (2) deputies immediately viewed "[n]umerous containers of chemicals and liquid fertilizers" and "[c]ommercial plant growing products" in the living room and open kitchen area.  The only testimony at the hearing was that there was a container in the living room containing "chemicals and stuff[.]"  Fourth, the affidavit states that "loose cannabis [was] atop the kitchen counter(s), and "packaged marijuana (approximately 2 ounces) were seen lying inside of the open master bedroom closet."  There was no such testimony at the hearing.

Even ignoring the above four facts when reviewing the warrant affidavit, the undersigned finds that the warrant affidavit sufficiently alleges probable cause to believe the house and the barn contained evidence of a crime based upon facts which were lawfully obtained during the entry into the residence and the subsequent walk around the barn.  See Franks, 438 U.S. at 171-72 (stating "when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required").

### V.  Conclusion

The officers' initial entry into the residence was lawful based upon the recognized emergency aid exception to the warrant requirement.  Further, the barn was not part of the home's curtilage.  Finally, the warrant contained sufficient information to support a finding of probable cause.  In light of the foregoing findings, the undersigned need not address the Government's alternative argument that officers relied in good faith on the warrant.  After due consideration, it is

**RECOMMENDED**:

That the Motion to Suppress Evidence (Doc. No. 19) be **DENIED**.

**RESPECTFULLY RECOMMENDED** at Jacksonville, Florida on August 3, 2011.

James R. Klindt

**JAMES R. KLINDT**
United States Magistrate Judge

kaw
Copies to:

Honorable Marcia Morales Howard
United States District Judge

Assistant U. S. Attorney (Savell)
James H. Burke, Jr., Esquire